# AFFIDAVIT IN SUPPORT OF A COMPLAINT AND WARRANT

I, Kevin M. Lewis, a Special Agent with the Federal Bureau of Investigation ("FBI"), Philadelphia Division, being duly sworn, depose and state as follows:

## INTRODUCTION

1. I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18 of the United States Code, in that I am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516. I have been employed as a Special Agent with the FBI since September 1996. Since February 1998, I have been assigned to the Philadelphia FBI Safe Streets Violent Drug Gang Task Force ("SSVDGTF"), which investigates, among other violations of federal law, criminal groups including those involved in the importation, distribution, and manufacturing of controlled substances, the laundering of the proceeds of those activities, weapons violations, and any and all tangential violence associated with the drug trade. I have specialized training and experience in narcotics distribution and money laundering investigations, including, but not limited to, the means and methods used by traffickers to purchase, transport, store, and distribute narcotics and to hide profits generated from those transactions. Prior to being employed as a Special Agent, I served seven years as a Tactical and Signals Intelligence officer in the United States Army.

2. I am the lead case agent for this investigation. The information contained in this affidavit comes from my own personal observations and from the observations of other law enforcement agents and officers involved in this investigation. Because this affidavit is being submitted for the limited purpose of securing an arrest warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only those facts that I

believe are necessary to establish probable cause that GREGORY JONES, EDWARD BASLEY, MARK ROSS and EDUARD NAHUN CHIRINOS AMADOR, conspired and agreed to distribute five kilograms or more of cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. § 846 and possessed with the intent to distribute five kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A).

## BACKGROUND OF INVESTIGATION

3. GREGORY JONES is a bulk cocaine trafficker who has distributed cocaine in the Philadelphia area since the early 2000s. In 2009, following a nine-day jury trial in the United States District Court for the Eastern District of Pennsylvania, JONES was convicted of conspiracy to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 846 and 841(a)(1), (b)(1)(A) and attempted possession with intent to distribute five kilograms of cocaine, in violation of the same. On March 30, 2012, JONES was sentenced to 216 months' imprisonment to be followed by five years of supervised release. On April 26, 2022, JONES received a Presidential commutation. JONES was released from confinement on April 26, 2023. JONES is presently on supervised release in this district.

4. EDWARD BASLEY is similarly a bulk cocaine trafficker who has distributed cocaine in the Philadelphia area since the early 2000s. In 2007, following a jury trial in the United States District Court for the Eastern District of Pennsylvania, BASLEY was convicted of distribution of cocaine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C); possession with intent to distribute more than 50 grams of cocaine base ("crack"), in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A); possession with intent to distribute more than 500 grams of cocaine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B); possession of a firearm in furtherance of a drug-trafficking crime,

in violation of 18 U.S.C. § 924(c)(1); and possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1). On October 7, 2008, BASLEY was sentenced to 300 months' imprisonment. On March 7, 2019, pursuant to the First Step Act, BASLEY's sentence was reduced to 180 months' imprisonment. BASLEY was released from confinement on October 18, 2019. BASLEY is presently on supervised release in this district.

5. For more than a year, the FBI has been investigating JONES, BASLEY, and others known and unknown for drug trafficking and money laundering offenses. Through this investigation, agents have learned that JONES and BASLEY are high-ranking members of a drug trafficking organization ("DTO") who distribute kilogram quantities of cocaine, primarily in the Philadelphia area. JONES and BASLEY regularly obtain bulk cocaine through multiple channels, but primarily from Mexico. The investigation has shown that the cocaine is concealed within tractor trailers and smuggled into the United States through the Mexican border. The cocaine is then driven by tractor trailer drivers to its ultimate destination in Philadelphia or the surrounding areas. Once the tractor trailer arrives, JONES meets with the tractor trailer driver and obtains the bulk cocaine that he and BASLEY distribute in kilogram amounts on behalf of the DTO in the Philadelphia area. Throughout the course of this investigation, I have learned that JONES has met with a truck driver on at least a monthly basis for at least the past six months. I believe, based on my training and experience, as well as the information obtained during this investigation, that JONES' bulk cocaine deliveries are often between 50 and 100 kilograms each. I further believe that JONES is paying his source of supply approximately $15,000 to $16,000 per kilogram.

6. JONES and BASLEY obtain bulk cocaine from multiple sources, including from a Mexico-based source of supply ("SOS Mexico") who coordinates the delivery of and payment

for bulk cocaine concealed within tractor trailers. In addition, JONES and BASLEY supplement their supply of cocaine through smaller cocaine purchases from other individuals within the DTO.

7. JONES and BASLEY launder the proceeds of their drug trafficking enterprise through various sources including business ventures and real estate purchases.

8. On or about March 13, 2026, the Honorable Gerald A. McHugh signed orders under 26-WT-2001-1 authorizing the interception of both oral communications and the recording of visual, non-verbal conduct within JONES' BMW vehicle (JONES' BMW). Pursuant to Judge McHugh's order, the FBI surreptitiously installed both listening devices as well as a video camera in the passenger compartment of JONES' BMW. Interceptions began on March 16, 2026.

9. As part of this investigation, agents identified numerous cellular telephones used by JONES and BASLEY, as well as other members of this DTO and multiple truck drivers. At various times, pursuant to search warrants, agents monitored location data or "pings" for these various phones. Agents also made extensive use of physical surveillance, used Philadelphia Police surveillance cameras, pole cameras, and at times, aerial surveillance. The FBI installed fixed pole cameras providing coverage of various stash houses, residences, and other locations relevant to this DTO's operation.

10. During the authorization period for the Title III interceptions, agents also monitored JONES in real time as he spoke with other drug traffickers, drug customers, sources of supply, and drug and money couriers working on behalf of his source of supply. These conversations occurred both in person, in or around the BMW, as well as on the telephone using traditional calls, FaceTime video calls, and encrypted messaging applications.

**PROBABLE CAUSE**

11. Since the wire interception period of GREGORY JONES' vehicles began in March 2026, the FBI has collected numerous calls, videos, and surveillance observations which show that JONES and BASLEY are high-level cocaine traffickers. The method of operation is sophisticated and designed to evade law enforcement detection. To receive shipments of cocaine, JONES will typically meet a tractor trailer in a pre-determined trucking parking lot in or around the Philadelphia area. Meetings are normally arranged via encrypted telephone apps. JONES will meet with truck drivers, who will hand him duffel bags filled with cocaine, and then JONES may hand the truck drivers money to be returned to the supplier. Other times, JONES will meet with money couriers in separate parking lots in or around the Philadelphia area to deliver money for drug shipments. To verify identities, JONES and the truck drivers use a common cartel verification method which involves JONES verifying a serial number on a U.S. currency bill and comparing it to a serial number sent to him by the supplier.

***March 16, 2026 – GREGORY JONES MEETS TRACTOR TRAILER AND ACCEPTS BULK DELIVERY OF COCAINE***

12. On March 16, 2026, the first day of wire interceptions on JONES' vehicles, agents intercepted JONES speaking with his Mexico SOS to coordinate a meeting with a truck driver. JONES then drove his BMW to a truck parking lot in the Bridesburg section of Philadelphia. In that lot, as captured on the wire from inside JONES' BMW, JONES met with a truck driver working with the Mexico-SOS. The truck driver gave JONES a large duffel bag from inside of the truck cab. Immediately following the exchange between JONES and the driver, JONES drove his BMW to a stash house. While JONES drove to the stash house, agents intercepted JONES speaking with BASLEY on the phone. During the conversation, JONES indicated he had just received "58." Based upon my training and knowledge of this investigation,

I believe JONES was confirming to BASLEY that he had just received 58 kilograms of cocaine from the truck driver.

13. In the days that followed this delivery, JONES met with multiple drug customers and provided them with kilograms of cocaine.

***May 6, 2026 - GREGORY JONES MEETS TRACTOR TRAILER AND ACCEPTS BULK DELIVERY OF COCAINE***

14. On May 3, 2026, agents monitoring communications within JONES' BMW intercepted a telephone call between JONES and a truck driver, later identified as ORENTHIAL BAILEY.[1] During the call, JONES asked BAILEY if BAILEY was coming to see him. BAILEY told JONES that he would be there on Tuesday. JONES told BAILEY that they (meaning, the cocaine suppliers) always told JONES that, which caused JONES to rush. JONES told BAILEY that he was glad that it was BAILEY coming to see him because he could communicate with BAILEY. Based on my training, experience, and this investigation, I believe that during this conversation, JONES and BAILEY were discussing an anticipated delivery of cocaine that was to be delivered by BAILEY. I further know that at least one of the drivers who met with JONES, including the two trips just before this interception, was primarily a Spanish speaker who required the assistance of the translator to coordinate his meeting with JONES.

15. Shortly after the call with BAILEY, agents intercepted a telephone conversation between JONES and BASLEY while JONES was in JONES' BMW. During this conversation, JONES told BASLEY that he just got off the phone with "the driver" and "the driver" told him

[1] BAILEY's criminal history includes aggravated robbery, firearms possession, and multiple drug-related convictions. On May 27, 2026, after observing suspicious driving behavior, Tennessee Highway Patrol officers stopped a truck driven by BAILEY outside of Knoxville, Tennessee. Within the cab of his truck, officers located approximately 89 kilograms of suspected cocaine.

(JONES) that he (the driver) will probably be here Tuesday. JONES told BASLEY that he (JONES) has to do "this shit" tomorrow and wrap all this shit up. Based upon my training, experience and knowledge of this investigation, I believe that the discussion of "wrap"[ping] is a reference to JONES wrapping up the money that JONES intended to provide to BAILEY as payment for the bulk cocaine and for BAILEY to transport back to the cocaine supplier and/or his representatives. I know that drug traffickers wrap money up to thwart law enforcement's use of drug dogs and also to secure the money during transit.

16. On May 4, 2026, at approximately 1:15 PM, agents intercepted a telephone conversation between JONES and the Translator who facilitated communications between JONES and JONES' SOS Mexico while JONES was in JONES' BMW. During the conversation, JONES told the SOS Mexico through the Translator that JONES had "7 something" (meaning, JONES has $700,000 in cash). The Translator then asked JONES if he could round it up to "750" (meaning, $750,000). JONES told the Translator and supplier that he had the "750." Based upon my training, experience and knowledge of this investigation, I believe that JONES' cocaine suppliers asked JONES to provide $750,000 as payment for cocaine received from BAILEY and to provide this money to BAILEY upon delivery.

17. After obtaining the load of cocaine from BAILEY that morning, JONES traveled back home. Just minutes after meeting BAILEY, JONES was intercepted in JONES' BMW talking to BASLEY on the telephone. During the call, JONES asked BASLEY if he was there and BASLEY replied that he was right in front of JONES' "crib" (meaning, home). A check of cell site and ping information for BASLEY'S cellular telephones revealed that BASLEY'S cellular telephones were registering on towers in the vicinity of JONES' residence at the time of

this call. Based on my training, experience, and this investigation, I believe JONES and BASLEY were planning to meet at JONES' residence.

18. At approximately 2:11 AM, JONES' BMW entered the parking garage for JONES' apartment building. JONES then exited JONES' BMW, however he could still be heard from outside of the vehicle. JONES then stated, "make sure that's 14 I gave you, Beeb." I know that "Beeb" is BASLEY's nickname. Based on this, I believe that JONES met with BASLEY in the parking lot and supplied BASLEY with at least 14 kilograms of cocaine that JONES had just obtained from BAILEY.

***May 6, 2026 -- EDWARD BASLEY MEETS WITH SEAN MURRAY AND SUPPLIES HIM WITH COCAINE***

19. On May 6, 2026, at approximately 3:22 PM, surveillance cameras outside of SEAN MURRAY's residence located at 7600 Stenton Ave, Philadelphia, PA captured BASLEY'S Escalade entering the parking lot. At around this same time, BASLEY's cellular telephones were registering on towers providing coverage to the area. Based on this, I believe that BASLEY was driving the Escalade. Shortly after the Escalade arrived, surveillance cameras showed that MURRAY entered the Escalade and remained inside for several minutes before exiting the Escalade. When MURRAY exited, he was carrying a large black bag that he carried into his apartment building. I believe the cocaine was concealed inside the large black bag which MURRAY carried into his building.

***May 7, 2026 -- ARREST OF SEAN MURRAY AND SEARCH WARRANT OF HIS RESIDENCE AT 7600 STENTON AVE, APT 3M, PHILADELPHIA, PA***

20. On May 7, 2026, the FBI executed a federally authorized search warrant on MURRAY's residence. During the execution of the warrant, agents found a black bag that appeared to be the same bag MURRAY was seen carrying when he exited the Escalade the day

before within the residence. Agents also located a fish tank in the living room that contained a secret compartment. Inside the compartment, agents located approximately 2,250 grams of bulk cocaine. Agents seized the suspected cocaine and conducted a field test that was positive for cocaine. Within the same secret compartment, agents located a loaded Taurus G2C, 9mm handgun and an extended magazine. Agents also located numerous purported food containers which actually contained hidden compartments for concealing drugs. These compartments contained an additional approximately 250 grams of cocaine. Based on my training, experience, and this investigation, I believe that MURRAY obtained some of the bulk cocaine from BASLEY the day prior.

***May 7, 2026 -- GREGORY JONES AND EDWARD BASLEY DISCUSS SEAN MURRAY'S ARREST***

21. Within hours of the search warrant on MURRAY's residence, agents intercepted a FaceTime call between BASLEY and JONES while JONES was sitting inside of JONES' BMW. During the conversation, BASLEY told JONES that "Shady" was locked up. I know that "Shady" is MURRAY's nickname. BASLEY then told JONES that he (BASLEY) had seen MURRAY the day before and that he (BASLEY) had given MURRAY "a chump." Based on my training and experience I believe that a "chump" is a kilogram of cocaine. During the conversation, BASLEY seemed nervous and shaken up by MURRAY getting arrested, in part, because he knew that he supplied MURRAY with cocaine.

***May 13 and 14, 2026 – JONES MEETS WITH TRACTOR TRAILER DRIVER TO SUPPLY DRUG PROCEEDS***

22. On May 13, 2026, at approximately 12:24 PM, agents intercepted a telephone call that occurred while JONES was inside JONES' BMW between JONES, the SOS Mexico and the Translator. During the call, JONES told the SOS Mexico through the Translator that he had to

drop supplies off and that he had someone waiting for some pieces (meaning, kilograms of cocaine). The Translator told JONES that his cousin (the driver) would not be there Friday but was going to be there tomorrow. JONES told the SOS Mexico through the Translator that he could have it done by tomorrow. JONES further stated that it “isn't all the way wrapped up” (meaning, JONES had not packaged all the money for transportation), but that he would have it done tomorrow by 11:00 AM. JONES and the SOS Mexico, with the assistance of the translator, then discussed the poor quality of the cocaine that was previously supplied to JONES. JONES stated that he tried to mix a little bit of the bad (cocaine) in with the good (cocaine) but that it messed the good (cocaine) up. JONES further stated that he did not know what was in that stuff (the bad cocaine), but JONES could not do anything with it. The SOS Mexico and the Translator told JONES to see if he could sell it. JONES replied that even if he could do that, they (his customers) are not going to pay full price for it.

23. JONES told the SOS Mexico and the Translator that he would prefer that they just take it. The SOS Mexico and the Translator told JONES that they would take it. JONES stated that one of them (the bad kilograms) was left and unopened. The SOS Mexico and the Translator asked JONES, “how many came out bad?” JONES replied that seven and the one that they didn’t even open, but that JONES had it all written down. The SOS Mexico and the Translator told JONES to take a picture of the product. JONES described the label as having a "C" on it and it was out of the 70 (meaning, the 70 total kilograms the supplier had previously supplied to JONES).

24. The SOS Mexico and the Translator apologized to JONES. JONES replied that if they are losing, they can deal with it but if it has the taste from whatever that stuff, they put it in, it destroys them. JONES further explained that you can't cook it off and you can't do anything

with it. The SOS Mexico and the Translator told JONES to take a picture of the label and how the product looks. JONES replied that he was about to go where some of them were and when JONES got there, JONES would FaceTime them to show them. JONES told the SOS Mexico and the Translator that he did not want to take a picture of it on this phone because he was using his "good" phone. The SOS Mexico and the Translator asked JONES to take a picture or video showing the label and how the product looked because they needed to show it to the people. JONES stated he would show it to them now and would call them back in about five minutes.

25. Based upon my training, experience and knowledge of this investigation, I believe that during this conversation, JONES and the SOS Mexico and the Translator initially discussed JONES packaging money and delivering it to a tractor trailer driver who the drug organization used to transport drugs and/or drug proceeds.

26. I believe that during the second part of the conversation, JONES and the SOS Mexico and the Translator discussed the poor quality of some of the kilograms of cocaine that were part of the most recent delivery to JONES. JONES explained that to remedy the problem he attempted to mix some of the bad cocaine with good cocaine, which ruined the good cocaine. JONES then explained that he could not sell the bad cocaine and would rather give back the seven to eight kilograms of cocaine that were poor quality. JONES then explained the state of the cocaine and that some of the cocaine was still in the original wrapper, while others did not have the original label. Furthermore, I know that drug traffickers often maintain multiple active cell phones for use in their illegal business. Traffickers do this to compartmentalize their business, often using one phone for customers, another to communicate with their source of supply, and often a different phone for routine, non-drug-related needs. Thus, when JONES was hesitant to photograph poor quality cocaine using his "good" phone I believe he was referencing his non-

drug phone. I also know that JONES is on supervised release in the Eastern District of Pennsylvania, and that he previously provided one phone number to probation while also using multiple other undisclosed phones during this investigation. Thus, I believe JONES was using his disclosed phone and did not want to risk incriminating himself by taking a photograph of illegal drugs while using it.

***June 3, 2026 – GREGORY JONES COMMUNICATES WITH MEXICAN SOURCE OF SUPPLY AND EDWARD BASLEY***

27. On June 3, 2026, at approximately 10:22 p.m., agents intercepted JONES as he spoke with an individual with a Spanish accent, previously identified as his Mexico SOS and translator. JONES asked the Mexico SOS when they thought they could get to him, meaning JONES. In response, the Mexico SOS said "you're next… I think it's Monday or Tuesday. It should be on the next truck; it's on the way…" The Mexico SOS then said, "If they get it before, we'll let you know." After JONES ended the call, he spoke out loud to himself, saying "We back up and running." I believe based upon my training and experience, and based upon this investigation, that the Mexico SOS was telling JONES that his next resupply of cocaine was already on the way, but that a different drug trafficker would receive a resupply first. Based on my experience, JONES' statement "we back up and running" was consistent with him believing he would soon have a new supply of cocaine to begin selling again.

28. After ending the call with the Mexico SOS, at approximately 10:28 p.m., JONES called Edward BASLEY. JONES told BASLEY that he "just talked to the people" and that they should be to them by Tuesday. Later in the conversation, JONES said they were only bringing "work" and not asking for money. JONES said they might still want money by the time they arrived. JONES also said he was going to "start wrapping that shit up" so that whenever they do arrive, "that shit will already be wrapped."

***Week of June 1, 2026 – JONES SPEAKS ABOUT BAILEY'S ARREST AND SEIZURE OF COCAINE***

29. Throughout the week of June 1, 2026, agents monitoring the wiretap intercepted GREGORY JONES speaking with multiple people. During several of those conversations, JONES referenced ORENTHIAL BAILEY's May 27, 2026, arrest by the Tennessee Highway Patrol and the seizure of 89 kilograms of cocaine. During some of these conversations, JONES referred to BAILEY as "his" driver.

30. Additionally, on June 5, 2026, agents intercepted JONES speaking with the Mexico SOS with the assistance of the translator. During the conversation, the two men referenced specific passages from the Highway Patrol's affidavit detailing the stop of BAILEY and seizure of 89 kilograms of cocaine. During the intercepted call, the two appeared to be reading from the affidavit itself. This leads me to believe, based on my training and experience, the two men took steps to obtain the affidavit and were reviewing it together to determine what law enforcement might know about BAILEY's activities and the activities of the larger DTO.

***June 6, 2026—JONES MEETS WITH MONEY COURIER***

31. As part of this investigation, agents obtained location or "ping" data for a cellular telephone used by a known money courier for the Mexico SOS. On June 6, 2026, the ping data showed the courier arrive in the area of a Pilot Truck Stop in Cinnaminson, New Jersey.

32. After the courier's arrival at the Pilot Truck Stop, location data for JONES' BMW and phones showed him traveling to 4902 Wyalusing Avenue, where he parked and entered one of the buildings. An FBI pole camera captured Mark ROSS meeting JONES at 4902 Wyalusing Avenue and entering the same doorway as JONES. ROSS remained inside the building the entire time JONES was also inside. When JONES left the building, he was carrying a bag with a large brick shaped object within it. JONES appeared to struggle lifting it, indicating it was heavy.

JONES placed the brick shaped object and bag into the trunk of his BMW. ROSS also exited the building at the same time as JONES, and the pole camera captured ROSS carrying a trash bag. Rather than place the trash inside a visible trash can outside the door to the building, ROSS placed the trash bag in the trunk of his vehicle and left with it.

33. Based on my training and experience, as well as this investigation to date, I believe that JONES traveled to the Wyalusing Avenue property to pick up a shrink-wrapped block of cash to provide to the courier. I believe this in part based upon intercepts prior to this meeting where JONES told BASLEY that he was going to "wrap it up" just in case the Mexico SOS changed his mind, as well as surveillance observations which show that JONES does not typically work on weekends at Wyalusing Avenue. Thus, his travel to this location on a Saturday to obtain this brick-shaped object leads me to believe it is pre-wrapped cash intended for the Mexico SOS. Likewise, I believe ROSS was present to assist JONES in packaging the bulk cash for delivery to the Mexico SOS, and I further believe, based upon my training and experience, that ROSS removed trash from that process when he left the building. I believe ROSS took the trash with him to avoid leaving incriminating evidence in a publicly accessible trash can.

34. After leaving 4902 Wyalusing Avenue with the bag, JONES traveled to his home and went inside. While JONES was still driving, agents intercepted JONES speaking to another person on the phone. During the call, JONES indicated he would be back on his other phone in five minutes. JONES also said, "Oh they're ready now?" JONES then said again he would be on his other phone in a few minutes. I believe this call was the Mexico SOS or another person working with them letting JONES know that the money courier was ready to meet. I believe JONES' reference to his "other" phone was a reference to a phone he used to communicate with the Mexico SOS, indicating he did not have that phone in his possession, but he would soon and

would be able to talk further once he had that phone with him.

35. JONES left his residence and traveled directly to the Pilot Truck Stop, where he met with the courier inside JONES' BMW. When the courier got into JONES' BMW, the two men once again confirmed identities using a dollar bill. The courier retrieved the same bag containing a large brick shaped item that JONES removed from a building at 4902 Wyalusing Avenue and returned to his truck. After the courier left with the bag, JONES departed the Pilot Truck Stop. Based on my training, experience, and this investigation as a whole, I believe that with the assistance of MARK ROSS, JONES retrieved a substantial sum of money from 4902 Wyalusing Avenue, which he then provided to the money courier as payment for bulk cocaine.

***June 23, 2026—JONES DISCUSSES SUPPLY ISSUES WITH THE SUPPLIER***

36. On June 23, 2026, at approximately 9:16 PM, agents monitoring communications within JONES' BMW intercepted a FaceTime call between JONES and the SOS Mexico. During the call, a third man acted as a translator for the supplier. During the call, JONES told the SOS Mexico that he identified two potential truck drivers that "already do it" but that he was not sure if they "[went] to Texas." JONES asked what they were "offering pay wise." The SOS Mexico told JONES that they would pay the person who found the driver "$50 for each piece every time." The SOS Mexico told JONES they would "need his information" and a "picture of his license where he lives" and "what he drives." The SOS Mexico told JONES to tell the prospective driver "If he does something funny or tries to rob them, they will cut his head off." The SOS Mexico asked JONES to call them when he "talked to the driver." JONES told the SOS Mexico they "need work up here bad." The SOS Mexico told JONES that they had a driver "in training" but were looking for more. The SOS Mexico explained that the driver is "coming back with some money" and as soon as he dropped off the money, they are "going to send him back

out with the work." The SOS Mexico told JONES that the driver would "be there either Saturday or Sunday" and that they would let JONES know. JONES asked where the driver was "taking the work." The SOS Mexico told JONES that it is going to another drug trafficker, but "if it takes a little longer it will go to" JONES. The SOS Mexico told JONES that they are waiting for the driver "to come with the money, so they can send him back" to JONES. After the call ended, JONES said out loud to himself, "Why isn't the work coming here?" Based on my training, experience, and this investigation as a whole, I believe that during this call, JONES and the SOS Mexico discussed an anticipated delivery of cocaine that is scheduled to come to either Philadelphia or another location.

***June 26, 2026—EXECUTION OF SEARCH WARRANTS ON 4902 WYALUSING AVENUE AND 1953 PLYMOUTH STREET AND SEIZURE OF EVIDENCE***

37. On June 26, 2026, agents monitoring communications within JONES' BMW intercepted a call between JONES and the SOS Mexico. During the call, the SOS Mexico alerted JONES that a truck was en route to the Philadelphia area and was approximately three hours away. Agents observed JONES traveling to the area of Southwest Philadelphia where he parked his BMW. Agents then observed a tractor trailer park nearby. Agents further observed JONES exit his BMW carrying a package and approach the tractor trailer and converse with the driver, later identified as EDUARD NAHUN CHIRINOS AMADOR. JONES exchanged the package with CHIRINOS AMADOR and retrieved at least one duffel bag from the truck, which JONES then placed into his BMW and departed the area. Agents continued monitoring JONES' location as JONES drove to his workplace located at 4902 Wyalusing Avenue, Philadelphia, PA. Once at his workplace, pole cameras covering the area showed that JONES parked his BMW, removed a bag from the BMW, and entered his workplace carrying the bag. A short time later, JONES exited his workplace and stood on the front steps of the building until BASLEY arrived driving a

Honda Pilot. JONES then removed a duffle bag from his BMW and put it into BASLEY's Honda Pilot.

38. Agents conducting surveillance then observed BASLEY leave 4902 Wyalusing Avenue and drive to his known stash house located at 1953 Plymouth Street, Philadelphia, PA. Agents executed a federally authorized search and seizure warrant at 1953 Plymouth Street. Inside, agents encountered BASLEY and recovered multiple brick shaped objects marked with "gulfstream" which each containing a white powdery substance that appeared to be consistent with kilogram quantities of cocaine on the kitchen counter. In the basement, agents recovered a duffel bag consistent with the one JONES put into BASLEY's Honda Pilot. Inside the duffel bag agents found additional suspected kilograms of cocaine, each also marked with "gulfstream." In total, agents recovered 33 suspected kilograms of cocaine. Agents conducted a field test on one of the suspected kilograms, which returned a positive result for cocaine. Agents also recovered two firearms in the kitchen and an additional firearm in the basement, specifically a black Smith and Wesson semiautomatic handgun, a black Taurus semiautomatic handgun, and a Ruger semiautomatic handgun.

39. Agents then executed a federally authorized search warrant at 4902 Wyalusing Avenue. Agents encountered JONES in the parking lot and provided JONES with his *Miranda* warnings. JONES led agents to a locked cabinet within his workplace. Inside the cabinet, which JONES had a key to, agents found and recovered 15 brick shaped objects, each containing a white powdery substance that appeared to be consistent with kilogram quantities of cocaine and stacks of money. Agents then searched JONES' BMW and recovered an additional 36 suspected kilograms of cocaine. Agents field tested one of the suspected kilograms of cocaine, which returned positive for cocaine.

40. Shortly after encountering JONES, MARK ROSS arrived at 4902 Wyalusing Avenue. ROSS reported to agents that he was never at that location after hours, or on weekends, and that he had never seen JONES handle money or drugs. As discussed above, ROSS' statements about his presence after hours and on weekends are directly contradicted by pole camera footage providing coverage to the area. ROSS identified keys as belonging to him. Agents then used those keys to access a locked cabinet inside 4902 Wyalusing Avenue. Inside the cabinet, agents found and recovered bundles of cash tightly wrapped in electrical tape, totaling more than $200,000. I know from my training and experience that drug traffickers often wrap money in electrical tape in preparation for transport to avoid apprehension and detection by law enforcement. After agents recovered the money, ROSS stated to himself, "It's over now. I'm finished."

41. Agents also stopped CHIRINOS AMADOR in Maryland and recovered $80,000 in bulk cash from inside his truck.

42. Based upon my review of the items located and seized as set forth above, and based upon my training and experience, I believe the cocaine seized was possessed in a manner consistent with distribution and that JONES, BASLEY, ROSS and CHIRINOS AMADOR were involved in distributing cocaine. I further believe that the money found inside 4902 Wyalusing Avenue was packaged in a manner consistent with drug trafficking. Moreover, I believe based upon my training and experience, that the presence of the firearms inside BASLEY's stash house at 1953 Plymouth Street is similarly consistent with drug trafficking. More specifically, in my training and experience, firearms are commonly possessed "tools of the trade" used by traffickers to protect themselves, their illegal products, and their profits as evidenced by their presence inside residence in the same compartment where bulk cocaine was stored.

***CONCLUSION***

43. WHEREFORE, based on my training, experience, and my knowledge of this investigation, I have probable cause to believe, and do so believe, that JONES, BASLEY, ROSS and CHIRINOS AMADOR conspired and agreed to distribute cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. § 846, and possessed with intent to distribute five kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A). There is also probable cause to believe that before JONES and BASLEY committed those offenses, JONES and BASLEY each had one or more convictions for a serious drug felony, that is JONES' conviction on or about March 30, 2012 in the Eastern District of Pennsylvania for conspiracy to distribute five kilograms or more of cocaine in violation of 21 U.S.C. § 846, and attempted distribution of five kilograms or more of cocaine, in violation of 21 U.S.C. § 846(a)(1), (b)(1)(A), and BASLEY's conviction on or about October 7, 2008 in the Eastern District of Pennsylvania for distribution of cocaine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C), possession with intent to distribute more than 50 grams of cocaine base ("crack"), in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A), and possession with intent to distribute more than 500 grams of cocaine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B), for which both JONES and BASLEY served more than 12 months of imprisonment and for which they served more than 12 months of imprisonment and for which they were released from serving any term of imprisonment related to their respective

convictions within 15 years of the commencement of these offenses.

Respectfully submitted,

*/s/ Kevin M. Lewis*
KEVIN M. LEWIS, Special Agent
Federal Bureau of Investigation

Sworn to and subscribed to me telephonically
this 26th day of June 2026.

/s/Craig M. Straw 6-26-2026
HONORABLE CRAIG M. STRAW
UNITED STATES MAGISTRATE JUDGE